UNITED STATES DISTRICT COURT 
 DISTRICT OF CONNECTICUT 

 Plaintiff 
CHRISTvO. PHER SCARPA, 
 , Civil No. 3:17cv2107 (JBA) 

PROVIDDEeNfeCnEd a&n tWsORCESTER RAILROAD, INC. and 
METRO-NORTH RAILROAD COMPANY, August 3, 2020 
 RULING DE. NYING DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT 

 Plaintiff Christopher Scarpa brings claims against Defendants Providence & 
Worcester Railroad Company (“P&W”) and Metro-North Commuter Railroad Company 
(“Metro-North”) under the Federal Employers’ Liability Act (“FELA”) and the Locomotive 
Inspection Act (“LIA”) for injuries suffered while employed by P&W as a train conductor. 
Defendants move for summary judgment on all counts of Plaintiff’s complaint. (Defs.’ Mot. 
for SI.u mBma.c Jk. g[Droouc.n #d 6 0].) For the reasons that follow, Defendants’ motion is denied. 
 Plaintiff Christopher Scarpa is employed as a railroad conductor by Defendant P&W. 
(Parties’ L.R. Stmts. [Docs. ## 60-15, 68, 73] ¶ 1.) Plaintiff was hired by P&W in 2013 and 
completed “extensive classroom and Iodn. -the-job training regarding safe railroad operating 
practices and railroad safety rules.” ( ¶¶ 2, 5.) P&W’s safe operating practices during the 
relevant time period required him to “use care to prevent injury to [him]self or others,” to 
“be alert and attentive at all times when perforImd.ing [his] duties,” to “plan [his] work to avoid 
injury,” and to “protect [his] own safety.” ( ¶ 3.) As a train conductor, Plaintiff was 
“responsible for . . . the safety and care of [his] train,” which inIcdl.uded an explicit requirement 
to “protect company property,” including radio equipment. ( ¶¶ 82-83.) 
 P&W acquired LoIdco. motive 4301 and modified it to meet Metro-North’s height 
clearance requirement. ( ¶¶ 6-10.) Metro-North inspected Locomotive 4301 afItde.r those 
modifications and “approved it to enter into service on Metro-North’s tracks.” ( ¶ 11.) 
Following the moIdd.ifications, Locomotive 4301’s height measured fifteen feet, four and thrIede.-
eighths inches. ( ¶ 12.) The height clearance requirement wIads. fifteen feet, six inches. ( ) 
Locomotive 4301 “had 3 radio antennas” in various locations. ( ¶ 54-56.) Prior to Plaintiff’s 
accident, antennas on LocomoItdiv.e 4301 had been damaged several times and had been 
replaced by a P&W employee. ( ¶¶ 57-60.) 
 On the evening of March 5, 2017, Plaintiff was working with Engineer Matthew 
Pilipaitis in LIdo.comotive 4301 to deliver a train from New Haven, Connecticut, to Fresh Pond, 
New York. ( ¶ 13.) “When Engineer Pilipaitis observed the first of a series of low bridges 
as they entered New York, he and the plaintiff joked that they should get ready to dIdu.ck 
because they were sitting up higher and they thought the roof was going to come off.” ( ¶ 
62.) While the train was on Defendant Metro-North’s New Haven line on Track 1, Plaintiff 
and Engineer Pilipaitis heard “what sounded like a scraping sound just under the Broadway 
Street Bridge,” and PIdla.intiff said, “I bet you that’s where we’ve been losing antennas, coming 
out to New York.” ( ¶¶ 14, 63.) Plaintiff then looked out the rear window of Locomotive 
4301 and turned on the light of his headlamp, which he was holding in his hand, and used it 
toId l.ook out the side window by shining the light upward toward where an antenna is located. 
( ¶ 64.) 
Id. Shortly thereafter, Plaintiff stuck his head out the window of the moving locomotive. 
( ¶ 15.) Plaintiff “struck his head on what was eventually determined Itdo. be a metal pipe 
hanging down from the catenary system under the Barry StrIede.t Bridge.” ( ¶ 17.) Engineer 
Pilipaitis yelled to Plaintiff to get back into the locomotive. ( ¶ 16.) Defendants assert that 
Engineer Pilipaitis yelled to Plaintiff “[w]hen he” stuck his head out the window, Ibdu.t Plaintiff 
asserts that Engineer Pilipaitis yelled as his head was being struck by the pipe. ( ) 
 Plaintiff’s head “would not have madIde. contact with the hanging pipe” if he had “kept 
his head inside of the moving locomotiveId.”. ( ¶ 24.) Plaintiff “was knocked unconscious and 
fell back into his seat, badly injured.” ( ¶ 19.) Plaintiff “has no memory of” this accident 
and “does not know exactly where his head actually made contact with the pipe” or whether 
“his headId w. ould have made contact with the hanging pipe” if Locomotive 4301 “had been 
lower.” ( ¶¶ 21, 27.) 
 After Plaintiff’s accident, a Metro-North tIrda.inmaster inspected Locomotive 4301 and 
observed that one of its antennas was broken. ( ¶ 68.) A piece of an antenna was found at 
the Broadway Street Bridge, but DefendIadn.ts deny that it was definitively linked to the 
damaged antennas on Locomotive 4301. ( ¶¶ 69-70.) On March 11, 2017, a P&W Iedn.gineer 
reported that the cab of Locomotive 4301 scraped the Broadway Street Bridge. ( ¶ 72.) 
Sometime thIde.reafter, P&W decided to discontinue use of Locomotive 4301 on the Metro-
North line. ( ¶ 74.) 
 Plaintiff asserts three claims. First, Plaintiff alleges that Defendant P&W was negligent 
in its operation of Locomotive 4301, in violation of FELA. (Second Am. Compl. [Doc. # 27] ¶¶ 
16-19.) Specifically, Plaintiff alleges that P&W was negligent by failing to properly inspect 
Locomotive 4301 to be safe for operating, by carelessly using Locomotive 4301 when it was 
not safe for operating in the service to which it was put, by operating Locomotive 4301 even 
though P&W knew or should have known that its vertical height would cause an unnecessary 
danger of personal injury, by carelessly modifying the roof of Locomotive 4301 to cause an 
uIndn. ecessary danger of personal injury, and by failing to act in a reasonably prudent manner. 
( ¶ 17.) Second, Plaintiff alleges that Defendant P&W operated Locomotive 4301 in 
violation of LIA in that it posed “an unnecessary danger of personal injury,” “was not sIadf.e to 
operate in service to which it was put,” and was not properly inspected for service. ( ¶¶ 
20-27.) Third, Plaintiff asserts that Defendant Metro-North was negligent in inspecting and 
approving Locomotive 4301 for use on its New Haven line anIdd. in maintaining and ensuring 
a fifteen foot, six inch vertical clearance for use on that line. ( ¶¶ 28-32.) 
 II. Discussion 

 Defendants argue that they are entitled to summary judgment in their favor because 
“nothing Defendants did or allegedly failed to do caused this incident,” but rather, Plaintiff’s 
accident occurred solely because of his decision to stick his head out the window. (Defs.’ 
Mem. Supp. Mot. for Summ. J. [Doc. # 60-1] at 3.) 
 Plaintiff responds that whether Defendants “were negligent for operating a 
locomotive or allowing it to be operated with a vertical height that would not fit under an 
overhead bridge without [scraping] and damaging its antennas” and whether “any such 
violation or negligence played a part, no matter how small, in causing” his injuries are 
questions which should be left to a jury. (Pl.’s Opp. to Def.’s Mot. for Summ. J. [Doc. # 67] at 
1.) Plaintiff also argues that there are several disputed issues of material fact which preclude 
summary judgment, including whether the locomotive scraped the bridge, whether Plaintiff 
and Engineer Pilipaitis discussed the scraping sound and the antenna just before Plaintiff 
stuck his head out the window, whether Plaintiff looked out the window to see if the 
locomotive lost an antenna, whether any antennas were damaged or replaced prior to or as 
a resuIldt .of his accident, and whether the same locomotive scraped the same bridge on a later 
trip. ( at A9.- 1L0e.)g al Standards 
 1. Summary Judgment 

 Summary judgment is appropriate where, “resolv[ing] all ambiguities and draw[ing] 
all permiHssoilbcolem fbac vt.u Ioaln ian Cfeorllences in favor of the party against whom summary judgment is 
sought,” ., 521 F.3d 130, 137 (2d Cir. 2008), “the movant shows that there 
is no genuine dispute as to any material fact and the movant is entitled to judgment as a 
matter of law,” Fed. R. Civ. P. 56(a). “A dispute regarding a material fact is genuine if the 
eWviildlieanmcse vi.s Ustuiccah Ctholalt. oaf rSeyarasocunsaeb lUen jiuvry could return a verdict for the nonmoving party.” 
 ., 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks 
omitted). “The substantive law governing the case will identify those facts that are material, 
and ‘[o]nly disputes over facts that might affect the outcome of Bthoue bsouuitl ius nvd. eTrr athnesp g. oWveorrnkienrgs 
lUanwio wn iollf pArmoperly preclude the entry of summary judAgnmdeernsto.’n” v. Liberty Lobby, Inc
 ., 442 F.3d 55, 59 (2d Cir. 2006) (quoting ., 477 U.S. 
242, 248 (1986)). When considering a motion for summary judgment, the Court may 
consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the 
record. Fed. R. Civ. P. 56(c). 
 “The Smaloavhiundgd pinar vty. Gboeoarrds the initial burden of showing why it is entitlCeedl otote sxu Cmomrpa. rvy. 
Cjuadtgremttent.” , 467 F.3d 263, 272 (2d Cir. 2006) (citing 
 , 477 U.S. 317, 323 (1986)). “Where, as here, the nonmovant bears the burden of proof 
at trial, the movant may show prima facie entitlement to summary judgment in one of two 
ways: (1) the movant may point to evidence that negates its opponent’s claims or (2) the 
movant may identify those portions of its opponent’s evidence that demonstrate the absence 
of a genuine issue of material fact, a tactic that requiIrdes identifying evidenCteilaortye xinsufficiency 
and not simply denying the opponent’s pleadings.” . at 272–73 (citing , 477 U.S. at 
323). “If the movant makes this showing in either manner, the burden shifItds to the 
nonmovant to point toM reactsoursdh eitvai dEelnecc.e Icnrdeuast.i nCgo a. vg.e Zneuniniteh isRsaudei oo fC morapt.e,rial fact.” . (citing 
Fed. R. Civ. P. 56(e); 475 U.S. 574, 586 
(1986)). “Like the movant, the nonmovant cannot rest on allegations in the pleadings anIdd 
must poCienlot tteox s,pecific evidence Mina tthsues rheitcao,rd to carry its burden on summary judgment.” . 
(citing 477 U.2S.. aLt I3A2 4a;n d FELA 475 U.S. at 586). 

 The Locomotive Inspection Act permits a locomotive to be used “only when the 
locomotive . . . and its parts and appurtenances . . . are in proper condition and safe to operate 
without unnecessary danger of personal injury.” 49 U.S.C. § 20701. Thus, no railroad carrier 
may “use or permit to be used on its line any locomotive unless the entire locomotive and its 
appurtenances . . . [a]re in proper condition and safe to operate in the service to which they 
are put, without unnecessary peril to life or limb” and have been properly tested. 49 C.F.R. 
§ 229.7. 
 The Federal Employers’ Liability Act provides that “[e]very common carrier by 
railroad” engaged in interstate commerce “shall be liable in damages to any person suffering 
injury while he is employed by such carrier . . . for such injury or death resulting in whole or 
in part from the negligence of any of the officers, agents, or employees of such carrier, or by 
reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, 
machinery, track, . . . or other equipment.” 45 U.S.C. § 51. 
 “In FELA actions, the plaintiff must prove the trTaudfiatiroienlalol vc.o Lmomngo Ins llaanwd Rel.Rem. Ceon.ts of 
negligence: duty, breach, foreseeability, and causation.” , 458 
F.3d 80, 87 (2d Cir. 2006). But “[c]ourts apply a more relaxed standard of boCtoha lnee vg. lMigeetnrcoe- 
aNnodrt cha Cuosamtmiount teor FRE.RL. AC on.egligence than to those arising under common law,” 
 , 621 F. App’x 13, 14 (2d Cir. 2015), because “the theory of FELA is 
that where the employer’s conduct falls short of the high standardK reernqaunir evd. A omf h. Dimre bdyg itnhge CAoc.t 
and his fault, in whole or in part, causes injury, liability ensues,” , 
355 U.S. 426, 438-39 (1958). “Thus, under FELA, an employer has a duty to provide its 
employees with a safe work place, which it has breached if it knew or should have known of 
a potential hazard in theT wuofarrkipellaloce, and yet failed to exercise reasonable care to inform and 
protect its employees.” , 458 F.3d at 87. “The raiClrSoXa dT’rsa dnuspti. eIsn ca. rve. mMceBarsiudreed by 
what is reasonably foreseeable under like circumstances.” , 564 
U.S. 685, 703 (2011) (internal quotation and alterations omitted). “PTrroaoyfl othr atv .t hMe edterfoe-nNdoarntht 
rCaoimlrmoaudt evr iRo.lRa.ted the LIA establishes such negligence per se.” Urie v. Thompson
 , 2002 WL 31319923, at *2 (S.D.N.Y. Oct. 16, 2002) (citing , 
337 U.S. 163, 189 (1949) (concluding that “a violation of” the Boiler Inspection Act, the 
predecessor to the LIA, is “negligence per se”). 
 The “test of a jury case” in a FELA action “is simply whether the proofs justify with 
reason the conclusion that employer negligence played anyR opgaerrts, ve. vMeon. Pthaec . Rsl.iRg.h Ctoe.st, in 
producing the injury or death for which damages are sought.” , 352 
U.S. 500, 506 (1957). “Accordingly, . . . an employer may be held liable unUdlfeikr vF.E MLeAt rfoo-rN roisrkths 
tChoamt mwuotuelrd Ro.tRh.erwise be too remote to support liability at common law.” 
 , 77 F.3d 54, 58 (2d Cir. 1996). Although “but for” causation does not suffice 
under FELA, plaintiffs in FELA actioMnsc Bnreidede not prove “proximate cause” as would be 
required in traditional tort actions. , 564 U.S. at 688. Rather, FELA’s causation 
requirement is satisfied “if the Irda.ilroad’s negligence played a part—no matter how small—
in bringing about the injury.” at 705. Plaintiff need only present plausible evidence of 
causation to reach a jUulrfyik, and “the right of the jury to decide questions of fact should also be 
liberally construed.” , 77 F.3d at 58. 
 Thus, in FELKAe ncadsaells ,v t. hMee “torrod-Ninoarrtyh sCuommmmaurtye rju Rd. gRm. ent standard is considerably more 
plaintiff-friendly,” , 2014 WL 1885528, at *2 (S.D.N.Y. 
May 12, 2014), and is “liberally construed in lVigahstq uoef zt hve. M setrtoron-gN foerdthe rCaol mpmoluictye ri nR .Rfa.vor of 
letting juries decide cases arising under FELA,” , 2014 
WL 134459B7. , aNte *g1l i(gSe.Dn.cNe. Y. Apr. 4, 2014). 

 To prevail on any of his claims, Plaintiff must demonstrate that Defendants breached 
a duty owed to him. Thus, he must show either that Defendants “knew or should have known 
of a potential hazard in theT wufoarrkieplllaoce, and yet failed to exercise reasonable care to inform 
and protect its employees, , 458 F.3d at 91, or that they violated LIA. 
 Defendants argue they are entitled to summary judgment because even if Locomotive 
4301 scraped the bridge as Plaintiff alleges, Defendants nonetheless did not violate LIA and 
were not otherwise negligent. According to Defendants, Plaintiff’s allegation “that the 
locomotive’s size was too large to travel on Metro-North’s rail lines” is “in and of itself . . . not 
a safety violation,” did not create a “hazardous condition,” and “posed absolutely no danger 
to ‘life or limb.’” (Defs.’ Mem. at 13.) In other words, Defendants argue that even if 
Locomotive 4301 scraped under bridges resulting in damaged antennas, it was nonetheless 
in “proper condition and safe to operate in the service to which” it was put “without 
unnecessary peril to life or limb,” 49 C.F.R. § 229.7, and thus was not negligently operated or 
in violation of LIA. 
 Defendants argue conclusorily that Plaintiff lacks any evidence that “either the height 
of the locomotive or the alleged scraping sound . . . were unsafe or hazardous conditions,” 
but they fail to explain precisely why a train’s failusreee to pass under a bridge without scraping 
is not unsafe or hazardous. (Defs.’ MTreamy.l oart 1v2. M-1e4t;r o-NDoretfhs. ’C Roempmlyu [tDeor cR. #ai 7lr3o]a adt 3.) InV saurnpepyo rvt. 
oNfo trhfoelikr &p oWsietsiotenr,n D Reafeilnrodaadn tCso c. ite and 
 Traylor (Def.’s Mem. at 13.) 
 In , the district court denied the plaintiff’s motion for summary judgment 
because the plaintiff failed to show that, as a matter of law or undisputed fact, a “window in 
need of repair” “Twraaysl ourn, safe to operate or that it presented an T‘urnaynleocressary’ danger of 
personal injury.” 2002 WL 31319923, at *2. The plaintiff in “ha[d] not shown 
‘the absence of a genuine issue of material fact’ as to whether the locomotive was safe to 
operate without ‘unnecessary’ danger of personal injury,” and thus summary judgment in 
his favor was improper, especially because “[c]ourts that have been confronted with such 
issues under both the present and prior versions of LIA hIda.ve typically concluded that they 
preTsreanytl oqruestions of fact for the jury to decide at a trial.” But although the defect at issue 
in —a window in need of repair—was relatively minor on its face, Defendants have 
failed to explain how the alleged defect at issue in this case—a height issue which caused the 
train to scrape undernTeraatyhlo ra bridge while traveling—is comparably inconsequential. 
Moreover, although the court denied summarpyo jussdibglmyent to the plaintiff on that basis, 
it did not suggest that such a minor defect could not form the basis of a FELA claim. 
See id. 
 Rather, it concluded only that the summary judgment record lacked evidence to 
“establish that the window was unsafe to operate or that it presented an ‘unnecesIdsa. ry’ 
danger of Vpaerrnsoeynal injury,” and thus left the question of liability for the jury to decide. 
 In , an engineer alleged that when he removed a radio from one locomotive to 
transport it to another locomotive, “he found that the strap was broken,” and later dropped 
the radio andV awrnase yi nv.j uNroerdfo wlkh &e nW heest e“rtnw Ris.tRe.d C”o .in order to prevent the falling radio from 
Vstarriknienyg him. , 899 F. Supp 280, 281 (S.D.W.V. 1995). The 
 court granted summary judgment for the defendant because it found “that a broken 
strap on a radio removed from a locomotive does not create an ‘unnecessary Ipde.ril of life or 
limb’ as a matter of law,” and that any argument to the contrary “defies logic.” At best, the 
court reasoned, “the condition of the radio handle required the plaintiff to hold the radio in 
a different manner in transit,” but “this condition did not present an ‘unnecessary pIedr.il of life 
and limb’ sufficient to invoke the Boiler Inspection Act,” the predecessor to LIA. at 282. 
But contrary to Defendants’ suggestion, the Court is not convinced that a train whose height 
caused it to scrape under a bridge while traveling cannot, as a matter of law, create an 
unnecessary peril to life or limb. 
 Plaintiff responds that, especially because FELA should be “liberally construed in the 
light of its prime Lpilulyrp vo. Gser,a tnhde T prruontke cWtieosnte orfn eRm.Rp. lCooy.ees and others by requiring the use of 
safe equipment,” , 317 U.S. 481 (1943), “[c]ommon sense 
dictates that” the failure of a locomotive to “fit under an overhead bridge without scraping” 
renders that locomotive uCnaslaafber tiott oo pve. rNaetwe w Yiotrhko,u Nt .uHn. n&e Hce.Rss. aCroy peril to life or limb (Pl.’s Opp. 
at 20W.) hPellaainn tvif. fP reenline sC eonnt ral Co. ., 287 F.2d 394 (2d Cir. 1961) 
and , 503 F. 2d 886 (2d Cir. 1974), two cases where the Second 
Circuit concluded that evidence of oil and ice on a locomotive was sufficient to allow the cases 
to be submitted to a jury on the question of whether the defendant railroad was negligent. 
Plaintiff argues that just as “engine surfaces [must] be kept clear of slippery substances” even 
though no specific safety rule outlines that requirement, “[l]ikewise, a locomotive must fit 
under an overhead bridge without scraping.” (Pl.’s Opp. at 20.) 
 Especially in light of the standards governing FELA claims and the clear preference 
for permitting juries to assess employer liability, Defendants have failed to demonstrate that, 
as a matter of law, Locomotive 4301’s height issues did not pose unnecessary peril to life or 
limb or that Defendants did not act negligently. Thus, Defendants have not demonstrated 
that they aCre. eCnatiutlseadt itoon s ummary judgment on this basis. 

 Defendants argue that they are nonetheless entitled to summary judgment in their 
favor because Plaintiff was theS eseo le cause of his injuries, and nothing Defendants did or did 
not do caused those injuries. ( Defs.’ Mem. at 14.) Defendants explain that Plaintiff caused 
his own injuries because “nothing on Locomotive 4301 injured Plaintiff”; had Plaintiff 
“merely kept himself inside of [the] cab, he would not have been injured”; and “his injuries 
were caused exclusively by his head mIdak. ing contact with the pipe – not from anything on or 
attached to the locomotive itself.” ( ) Thus, according to DefendIadn.ts, “[e]ven if P&W 
violated the LIA, . . . that violation did not cause [Plaintiff’s] injuries.” ( ) 
 Defendants assert that the “scraping sound,” which Plaintiff suggests prompted him 
to stick his head out the window,I ids. “too far removed and too remote” from Plaintiff’s injury 
to support a causation finding. ( ) Defendants argue that the scraping of the bridge was 
“mIde. rely . . . a condition or situation in which the accident happen[ed] from other causes.” 
( ) In other words, Defendants argue that the scraping was only a “but forR”o gcaeurss e of 
PMlcaBinrtidifef’s injuries, which is insufficient to demonstrate FELA causation under and 
 . Instead, according to Defendants, “Plaintiff’s negligence alone was the sole cause of 
his accident” because he chose to “disregard railroad rules and safety practices and put his 
life . . . in danger by sticking his head out of a moving locomotive cab window under these 
dangerous conditions,” and because Idh.e would not have been injured “had he simply 
remained inside the locomotive cab.” ( at 15-16.) 
 Defendants analogize to several cases where the defendant’s negMlicgBernidcee may have 
been a “but for” cause of Stheee plaintiff’s injury but Ndiicdh onlosto nm ve. eEtr iteh Re. R. Co. causation 
standard for FELA actions. ( Defs.’ Reply at 6-7.) In , 253 F.2d 939, 
940 (2d Cir. 1958), the Second Circuit affirmed the district court’s dismissal of a FELA action 
after the close of Nevicidheonlscoen because the “causation requisite for recovery under the F.E.L.A. 
[wa]s lacking.” In , the defendant had failed to provide “women’s toilet facilities” in 
the plaintiff’s workplace, and the plaintiff was injured by a passenger’s suitcase while 
searching for alternative facilities to use. The Second Circuit recognized that “[i]f defendant 
had supplied indoor toilet facilities plaintiff would not have been where the passenger’s 
baggage struck her,” but concluded that the defendant’s failure to provide those facilities and 
the plaintiff’s injury “were tooI fda.r removed from one aMnootohdeyr vi.n B sopsatcoen aanndd t Mimaein teo sCaotripsfy the 
requirements of the F.E.L.A.” at 941. Similarly, in ., 921 
F.2d 1 (1st Cir. 1990), the First Circuit found causation lacking where the defendant 
employer had caused the plaintiff to work long hours and get MtocoB rliitdtele, sleep, and plaintiff 
died of a heNaircth aotlstoacnk fourM doaoydsy after his most recent shift. In the Supreme Court 
cited both and as examples of FELA cases where “juries would have no 
warrant to award damages in far out ‘but for’ scenarios.” 564 U.S. at 704. Defendants argue 
that the connection between any problems with Locomotive 4301 and Plaintiff’s injury is 
similarly tenuous and “far out.” 
 Plaintiff responds that there is “ample evidence” on which a jury could find that 
Defendants caused his injuries. (Pl.’s Opp. at 22.) Plaintiff argues that his case beAarnsd emrosorne 
vsi. mBialaltriimtioerse t oO c.&asRe. sC wo.hich have been submitted to a jury to determine causation. In 
 , 89 F.2d 629 (2d Cir. 1937), the Second Circuit concluded that the 
question of causation should have been submitted to a jury where a railroad employee had 
been struck by a passing train after getting off his train and walking along its side to remedy 
a malfunction which had caused the train to stop. The defendant in that case argued that the 
plaintiff’As n“doewrnso anc t in placing himself in a position of danger” was the sole cause of his death, 
but the court rejected that argument, reasoning that “his conduct was a normal 
reaction to the stimulus of a situation created by the dseeefe anldsoa nRti’csh vairodlas tvio. Cno onfs oitlsid sattaetdu tRoariyl 
dCourtyp” under the Boiler Inspection Act. 89 F.2d at 631; 
 ., 330 F.3d 428 (6th Cir. 2003) (reversing district court’s grant of summary judgment for 
defendant because question of causation should have been submitted to jury where plaintiff 
was inCjuurreradn while walking the length of his train to determine the cause of an undesired 
stop); , 161 F. Supp. 3d at 259-60 (denying defendant’s motion for summary judgment 
and rejecting defendant’s argument that only “but for” causation was present where plaintiff 
was injured while using a drill to repair problem allegedly stemming from defendant’s 
negligence). 
AndersoTnheR Cicohuarrtd asgrees Cwuirtrha nP laintiff thMaoto tdhye factsN oicfh tohlsiso ncase Mbeoaord ym ore sNiimchiloalrsiotnies to 
 , , and than to and . In and , the 
defendant’s challenged actions set off a series of unforeseeable events which, inA cnodmerbsionna tion 
wRiicthha erxdtsernal factors, ultimately led to the plaintiff’s injury. But here, like in and 
 , a jury could find that Plaintiff’s injury stems directly from his response to the 
problems with Locomotive 4301, even though he may have placed himself in some danger 
in responding as he did. 
 Separately, the parties also dispute Plaintiff’s obligations under P&W’s employee 
policies and the impact of those obligations on his claims. Plaintiff characterizes the policies 
as having imposed upon him a duty to investigate the scraping noise, including by sticking 
his head out the window. But Defendants argue that their policies prohibited Plaintiff from 
doing anything which might risk injury, and thus that his injuries stem entirely from his 
choice to disregard those policies. 
 Plaintiff suggests that by looking out the window to investigate, he “was performing 
an act in the course of his duty as a conductor that was a natural and not unusual act given 
the factual circumstances surrounding the incident.” (Pl.’s Opp. at 22.) Plaintiff continues 
that it was a “normal human reaction for a train conductor to look out a window on a 
locomotive tIod .investigate if the bridge the locomotive had just scraped under was damaging 
antennas.” ( at 27.) Moreover, he argues, “ eIndg.;inseeee rs and conductors were permitted to 
look out the w indows of moving locomotives.”( Ex. 2 (Pilipaitis Dep.) to Pl.’s Opp. [Doc. 
# 67-2] at 27(Engineer Pilipaitis’s testimony that he was not “aware specifically” of any rule 
prohibiting employees from putting their head out the window and that he did put his head 
out the window on occasion).) Plaintiff also argues that conductors wer es “ereequired to protect 
company property, including radio equipment.” (Pl.’s Opp. at 28; Ex. 11 (NORAC 
Operating Rules) to Pl.’s Opp. [Doc. # 67-11] at 12 (“Company property must be protected. If 
Company property is endangered, employees must unite to protect it.”).) Thus, Plaintiff 
argues, a reasonable jury could conclude that his choice to put his head out theS eloec iodm. otive 
window was a foreseeable reaction in fulfillment of his duties as an employee. ( ) 
 In contrast, Defendants characterize Plaintiff’s choice to stick his head out the 
window as “knowingly disregard[ing] safe railroad operating practices and procedure, as 
well as his training.” (Defs.’ Mem. at 15.) Specifically, Defendants argue that their policies 
prohibited Plaintiff from lookings oeeu t the window as he did “because he was putting his life 
in jeopardy.” (Defs.’ Reply at 3; Ex. 3 (Transp. Safety Rules & Procs.) to Defs.’ Mot. for 
Summ. J. [Doc. # 60-4] at 13 (“You must use care to prevent injury to yourself or others. You 
must be alert and attentive at all times when performing your duties and plan your work to 
avoid injury. . . . You must protect your own safety.”).) Defednodeasn ntso tconclude that any 
requirement for Plaintiff “to look after his employer’s property give him the right 
to put himself in harm’s way.” (Defs.’ Reply at 5 (emphasis in original).) 
 But the approach urged by Defendants would seriously alter the relief available to 
FELA plaintiffs in a manner inconsistent with the goals and implementation of that statute. 
“[U]nder FELA, an employer has a duty to provide its employees with a safe work place, 
which it has breached if it knew or should have known of a potential hazard in the wTourfkaprilealcloe, 
and yet failed to exercise reasonable care to inform and protect its employees.” , 
458 F.3d at 87. Defendants’ theory would permit employers to escape liability for failure to 
provide “a safe work place” simply by enacting employment policies which require 
employees to avoid injury and protect their own safety. Thus, under Defendants’ theory, 
nearly any choice by an employee which might have increased the risk to his own safety 
would break the causal link and absolve the railroad of liability. Especially in lighKt eonfd tahlel, 
“considerably more plaintiff-friendly” summary judgment standard in FELA cases, 
2014 WL 1885528, at *2, the Court will not characterize Plaintiff’s choice to put his head out 
the window under these circumstances as an unforeseeable violation of Defendants’ vague 
employment policies as a matter of law. 
 Finally, Defendants argue that summary judgment is proper because Plaintiff’s case 
rests too heavily on speculation and conjecture because Plaintiff “admitted that he did not 
know where he struck his head on the pipe so he could not say with any specificity and 
certainty that if the locomosteivee a lhsaod been different dimensions he would not have been 
injured.” (Defs.’ Mem. at 17; Defs.’ Reply at 2.) But the Court disagrees that it would 
be “pure speculation” to conclude that Plaintiff chose to put his head outside the train 
window in response to the train’s scraping sound. Engineer Pilipaitis testified: 
 We just heard something made contact, scraping. And we looked at each other 
 and said “Did you hear that, I think something – I think we – I think we scraped 
 the bottom of the bridge.” And that led into the antenna. Because [Plaintiff] 
 said “I bet you that’s where we’ve been losing antennas, coming out to New 
 York.” . . . So he thought that’s where we have been losing these antennas. And 
 I agreed, I thought that made sense. . . . And 20, 30 seconds later, there’s 
 another bridge or set of bridges. And [Plaintiff’s] window was already open. 
 And he had his headlamp, not on his head, but in his hands, turned on. And as 
 getting his light ready. And he went out the window to look, you know, just to 
 shine his light. . . . [H]e went like this, to shine the light up, to where the – 
 because the antenna is right above the window. And that’s when something hit 
 him or he hit, you know – that’s when he got injured. 

(Pilipaitis Dep. at 14-15.) Engineer Pilipatis’s testimony provides circumstantial evidence 
from which a jury could conclude that Plaintiff was endeavoring to investigate the scraping 
sound at the time of his injury, and thus, contrary to Defendants’ suggestion, any such finding 
need not be based upon speculation. 
 Thus, Defendants have failed to demonstrate that no reasonable jury could find “that 
employer negligence played aRnoyg pearrst, , even the slightest, in producing the injury or death for 
which damages are sought.” 352 U.S. at 506. The causal link between Locomotive 
4301’s height issues and Plaintiff’s injuries is not so tenuous as to be merely “but for” 
causation. The “test of a jury case” in a FELA action “is simply whether the proofs justify with 
reason the conclusion that employer negligence played any Ipdart, even the slightest, in 
producing the injury or death for which damages are sought.” . On the record before the 
Court, Defendants cannot show that “employer negligence” did not play “even the slightest” 
part in producing Plaintiff’s injuries. Rather, especially in light of the liberal FELA standards 
on summary judgment, a jury should determine whether Defendants violated LIA or were 
otherwise negligent, and if so, whether such negligence played a causal role in producing 
Plaintiff’s injuries. 
 III. Conclusion 

 For the foregoing reasons, Defendants’ Motion for Summary Judgment [Doc. # 60] is 
DENIED. 

 IT IS SO ORDERED. 

 /s/ 
 Janet Bond Arterton, U.S.D.J. 

 Dated at New Haven, Connecticut this 3rd day of August 2020.